UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| RAY F. ROBERT, | ) | |
|     *Plaintiff*, | ) | |
| | ) | |
| *vs.* | ) | 1:09-cv-0425-JMS-TAB |
| | ) | |
| DOUGLAS G. CARTER, individually and in his | ) | |
| capacity as Sheriff of Hamilton County, | ) | |
| Indiana, HAMILTON COUNTY COUNCIL, and | ) | |
| HAMILTON COUNTY BOARD OF | ) | |
| COMMISSIONERS, | ) | |
|     *Defendants*. | ) | |

## ORDER

Plaintiff Ray Robert alleges that Defendants Douglas G. Carter, the Hamilton County Council and the Hamilton County Board of Commissioners ("Defendants") failed to exempt him from TASER training or to provide him a reasonable accommodation in violation of his rights under the Americans with Disabilities Act ("ADA"). He further claims that Defendants terminated his employment without a hearing in violation of his procedural and substantive due process rights. Presently before the Court is Defendants' Motion for Summary Judgment. [Dkt. 51.]

### I.
#### STANDARD OF REVIEW

A motion for summary judgment asks that the Court find that a trial based on the uncontroverted and admissible evidence would, as a matter of law, conclude in the moving party's favor and is thus unnecessary. *See* Fed. R. Civ. Pro. 56(c). When evaluating a motion for summary judgment, the Court must give the non-moving party the benefit of all reasonable inferences from the evidence submitted and resolve "any doubt as to the existence of a genuine

issue for trial . . . against the moving party." *Celotex Corp. v. Catrett*, 477 U.S. 317, 330 n.2 (1986). Nevertheless, "the Court's favor toward the non-moving party does not extend to drawing inferences that are supported by only speculation or conjecture." *Singer v. Raemisch*, 593 F.3d 529, 533 (7th Cir. 2010). The non-moving party must set forth specific facts showing that there is a material issue for trial and cannot rely upon the mere allegations or denials in the pleadings. Fed. R. Civ. Pro. 56(e); *Celotex*, 477 U.S. at 330. The key inquiry is the existence of evidence to support a plaintiff's claims, not the weight or credibility of that evidence, both of which are assessments reserved to the trier of fact. *See Schacht v. Wis. Dep't of Corrections*, 175 F.3d 497, 504 (7th Cir. 1999).

In reviewing the record, the Court is mindful, as the parties should be, that a party asserting a genuine factual dispute must support that assertion by citing to the record or by showing that the adverse party cannot produce admissible evidence to support the fact. Fed. R. Civ. Pro. 56(c)(1). Furthermore, under Rule 56(e), if a party fails to properly support an assertion of fact, or to address the adverse party's assertion of fact, the Court will consider it undisputed for the purposes of the motion.

## II.
### BACKGROUND

Mr. Robert began working with the Hamilton County Sheriff's Department ("HCSD") in 1979 as a merit deputy police officer in the patrol division. [Dkt. 55-1 at 2-4.] He was assigned by the sheriff to various positions within the HCSD in the patrol division, investigations bureau, and the county jail. [*Id.* at 2-12.]

Beginning in 2003, Mr. Robert suffered from neck/back pain for which he underwent surgery in November 2004—he returned to work eight weeks later. [Dkt. 53-2 at 4-5, 7.] Despite his back problems, Mr. Robert was able to perform the duties, trainings, and other

essential functions of being a police officer without accommodation. [Dkt. 55-1 at 37-38, 41-42, 51-52; dkt. 53-2 at 2-3, 7-8.]

Generally, civil and merit deputies must undergo eight hours of physical tactics training before graduating from the Indiana Law Enforcement Academy. [Dkt. 53-11 at 38, 63; dkt. 53-6 at ¶ 13.] But since 2003, Sheriff Douglas Carter, who oversees all merit and civil deputies, has required HCSD merit and civil deputies to attend four-to-eight additional hours of physical tactics training. [Dkt. 53-6 at ¶ 14.] Although tactics instructors provide instruction to reduce the risk of injury, the nature of the training is physical, and thus corresponds with likelihood of injury. [Dkt. 55-1 at 56-58; dkt. 53-2 at 1-2; dkt. 53-23 at 14.] The Sheriff allows certain medical exemptions from this training. [Dkt. 53-6 at ¶ 13.]

In 2007, Mr. Robert retired from being a merit deputy. [Dkt. 53-2 at 15.] At that time, he began receiving his merit deputy pension. [Dkt. 53-6 at ¶¶ 40-41.] He also began working as a civil deputy process server, which is a non-merit deputy position. [Id.; dkt. 55-1 at 14.] Non-merit employees within HCSD are at-will employees, defined by the Hamilton County Employee Handbook as employees who may be discharged by the employer "at any time with or without cause." [Dkt. 53-13 at 8.] Mr. Robert received and acknowledged the Handbook upon changing positions. [Dkt. 53-4 at 8; dkt. 60-1 at ¶ 10; dkt. 53-6 at ¶ 72; dkt. 53-2 at 17-19.] As a civil deputy process server, he reported to Sheriff Carter, who, according to the Handbook could remove him from that position at any time without cause. [Dkt. 53-13 at 8, 38, 54; dkt. 53-2 at 20-21; dkt. 60-3 at 13.]

Mr. Robert's job as a civil process server primarily consisted of serving legal documents, such as summonses, complaints, and eviction orders, [dkt. 53-2 at 14-15], as well as entering data and occasionally performing duties as a courthouse security officer and transportation

officer, [*id.* at 25-29].  While on the job, Mr. Robert wore khakis and a polo shirt with the HCSD logo (in contrast to the detective uniform he wore as a merit deputy) and drove an unmarked county vehicle.  [Dkt. 53-2 at 30, 32-33.]  Because this position principally involved driving, the HCSD provided him with a car, insurance, gas, and repair expenses.  [Dkt. 53-2 at 32-33.]

When Mr. Robert became a civil process server, Sheriff Carter appointed him as a "special deputy"—a type of civil deputy with law enforcement powers under I.C. § 36-8-10-10.6.  [Dkt. 53-6 at ¶ 48-51.]  This permitted Mr. Robert to possess and carry a handgun and to have arrest powers. [Dkt. 53-11 at 11, 13-14, 95-96; dkt. 53-6 at ¶ 54.]  Sheriff Carter felt civil process servers must have law enforcement authority since they often deliver unwelcome paperwork that has the potential to provoke conflict. [Dkt. 53-11 at 14-15; dkt 53-6 at ¶ 49.]  Although Mr. Robert agreed with Sheriff Carter's assessment, [dkt. 55-1 at 32-34], he testified he was never aware of his status change to special deputy.  [Dkt. 59 at 15; dkt. 60-1 at ¶ 8.]

In 2008, Sheriff Carter instituted a policy requiring all civil deputy process servers (among other deputies) to carry TASERS as part of their non-lethal weaponry.[1]  [Dkt. 53-6 at ¶ 26.]  At that time, he deemed carrying a TASER, and, accordingly, TASER training, "essential functions" of being qualified as a civil deputy.  [*Id.* at ¶ 61].  Thus, any deputy required to carry a

---

[1] As Mr. Robert points out, some special deputies, such as security guards in Conseco, deputies stationed at Riverview Hospital, and other privately-contracted deputies, carry guns but do not carry TASERS.  [Dkt. 64-2 at 8.]  Although these special deputies have limited law enforcement authority they are not employees of HCSD, nor does Mr. Robert present any evidence that they have the same qualifications or duties.  [Dkt. 53-6 at ¶¶ 53-56.]  Mr. Roberts also points out that the requirement to carry TASERS has not been adopted by all police departments.  [Dkt. 60-10.]  Although Mr. Robert's intention is to compare the HCSD process servers to other special deputies and to officers in other police departments, he has not provided the Court with the "necessary comparative evidence" to make that leap.  *Dandy v. United Parcel Service, Inc.* 388 F.3d 263, (7th Cir. 2004) (holding that plaintiff failed to show she was similarly situated to her comparators without evidence that they shared the similar "attributes, experience, education, and qualifications relevant to the position").  Without the necessary comparative evidence and some cogent analysis on the part of Mr. Robert, the Court must conclude that the comparators he invokes are irrelevant to HCSD's practices and policies.

TASER must complete one session of TASER training.[2]  [*Id.* at ¶ 17.]   The Sheriff deems this training, like the physical tactics training, "very important;" however, unlike the physical tactics training, medical exemptions from TASER training are not allowed.  [Dkt. 59 at 2; 64-1 at 9-10; dkt. 64-2 at 9; dkt. 59 at 2.]

To pass the TASER training, every deputy must receive a single one-to-five-second exposure to the TASER.  [*Id.* at ¶¶ 20, 24, 27.]  According to Sheriff Carter, TASER exposure:

- teaches deputies firsthand the effect of TASER on a combatant,

- teaches the impact of TASER on the officer, which is vital if a combatant has a TASER or takes the deputy's TASER during a struggle,

- teaches how quickly the tased individual recovers from temporary neuro-muscular incapacitation,

-  illustrates the potential for ongoing threat to bystanders to TASER exposure,

- disabuses officers of the common myth that they will be shocked if they touch a person who is receiving exposure,

- bolsters deputies' credibility as witnesses testifying to TASER use and exposure,

- deters deputies from abusing this weapon.

[*Id.* at ¶¶ 33-34.]

When Mr. Robert was scheduled to undergo the TASER training in 2008, he produced medical documentation indicating that, due to his back condition, he should not participate in the

---

[2] Mr. Robert complains that the County Handbook and the Sheriff's Department Rules and General Orders say nothing about the specific requirements of TASER training.  [Dkt. 59 at 2.] However, he cites no authority for the proposition that in order for a function to be deemed essential, it must be in writing.

training.[3]  [Dkt. 88-1; dkt. 53-2 at 4.]  Although Sheriff Carter did not feel Mr. Robert needed to be exempted from the training, he abided by Mr. Robert's stated needs and excused him.  [Dkt. 53-6 at ¶ 59.]  Without completing the training, however, Sheriff Carter would not authorize Mr. Robert to carry a TASER.  [Dkt. 60-1 at 13.]   And because Sheriff Carter had determined earlier that carrying a TASER, after having received TASER training, were essential functions of the civil deputy position, Mr. Robert's stated need to be excused from the training precluded him from being able to perform what Sheriff Carter had deemed his essential job duties.  [*Id.* at ¶ 59.] Consequently, Sheriff Carter determined that Mr. Robert could not continue in his capacity as a civil deputy process server.  [Dkt. 53-7.]

Because Mr. Robert was unable to undergo TASER training, [dkt. 53-2 at 55], Sheriff Carter offered him an accommodation.  In his letter, he stated, "Due to your inability to take the complete TASER training, you cannot become qualified to use the TASER.  Therefore, you are unable to perform an essential function.[4]  The accommodation was reassignment to a control-room position in the jail, which would not require him to carry a TASER (or to undergo TASER training).  [*Id.* ¶ 63; dkt. 53-7 at 1-2.]  At the time, there were no open positions that did not involve the use of a TASER, so Sheriff Carter proposed the control-room position to the County Council for approval and finalization by December 1, 2008.  [Dkt. 53-6 at ¶ 62-66.]  The new position—which was approved by the Council—would involve monitoring inmates on a

---

[3] Although during this litigation, Mr. Robert has introduced evidence of myriad physical ailments unrelated to his back problem, [*see* dkt. 59 at 18-22], he requested exemption from TASER training solely because of his back problems:  "He could not be tased because he was under treatment for chronic back problems and had a metal device in his spine."  [Dkt. 59 at 9.] Likewise, the physicians consulted prior to his TASER training concluded that he should not undergo the training solely because of his back problem.  [Dkt. 60-1 at 13.]

[4] Mr. Robert points out that the November 19 letter does not characterize the TASER training as essential.  While that statement is true, the letter does state that Mr. Robert's inability to undergo training precludes him from carrying a TASER, and carrying the TASER was an "essential job function."  [Dkt. 53-7 at 1.]

computer screen from inside the control room. [Dkt. 53-7 at 2.] The new job would have the same rate of pay, the same hours, and the same benefits as Mr. Robert's old job, [*id.* at 1-2]; however, it would not include a department car, gas, car insurance, or repair payments because the new position would not involve driving, [dkt. 53-11 at 76]. Like Robert's process server position, the control room position was also a non-merit, at-will position. [Dkt. 59 at 14.]

Mr. Robert was given until November 26, 2008 to accept the transfer—if he did not, his position as special deputy would be terminated on December 1. [*Id.* at 2.] On November 26, Mr. Robert met with Sheriff Carter to discuss the position. [Dkt. 53-6 at ¶ 67.] At that time, Mr. Robert refused the transfer offer because he thought it was tantamount to punishment. [Dkt. 53-10 at 2; dkt. 53-2 at 48-49; dkt. 60-1 at ¶ 29.] He did not ask for any other accommodation. [Dkt. 53-6 at 12.] The control-room position remained available to him until December 1, 2008. [Dkt. 53-2 at 55-56.]

Since commencing this litigation, Mr. Robert has presented a host of other physical ailments, none of which impeded his work performance over the previous 29 years, and none of which he claims to have disclosed to Defendants during the time period in question.[5] [Dkt. 73 at 3; dkt. 53-6 at ¶¶ 59-60.] These alleged physical problems include degenerative spine disease, peripheral polyneuropathy in both feet and legs, Crohn's disease, and osteoarthritic joint disease. [Dkt. 88-1 at 2.] Although they apparently do not impact Mr. Robert's "exemplary" performance as a civil deputy process server, [dkt. 60-1 at ¶ 7, dkt. 59 at 18], Mr. Robert contends they do impact the following life activities: the timing of what he eats, when he eats, and the quantity of food he eats, his sometimes urgent need to use the restroom, his inability to

---

[5] In his 2008 letter, Dr. Moffatt mentioned Mr. Robert's Crohn's disease and the operations he underwent as a result. He noted, however, that there were "no complications" from either at that time and, after complete physical examination, did not express concern about any ailments unrelated to Mr. Robert's back. [Dkt. 60-1 at 13.]

sleep without interruption every two-to-three hours because of numbness/swelling in his legs, his energy level, his inability to walk more than a quarter mile without severe pain, and his inability to sit in the same position for an extended period of time.  [Dkt. 60-1 at 3-4; dkt. 88-1.]

### III.
#### DISCUSSION

Mr. Robert contends that Defendants failed to reasonably accommodate his disabilities and thereafter terminated him in violation of the ADA.  He also brings claims under 42 U.S.C. § 1983 for a procedural due process violation on the ground that he was summarily fired from his position as a civil deputy process server without a hearing, as well as a substantive due process claim on the ground that the implementation of the TASER training policy was arbitrary and irrational.[6]  [Dkt. 59 at 1-2.]

### A)  Mr. Robert's ADA Claim

Mr. Robert claims that he is entitled to protection under the ADA; as such, he argues that Defendants failed to accommodate his disability when he requested—and was denied— exemption from TASER training.  [Dkt. 59 at 19.]

The version of the ADA that was in effect when Mr. Robert was terminated protects "a qualified individual with a disability" from discrimination because of that disability.[7]  42 U.S.C.

---

[6] In his Amended Complaint, Mr. Robert seeks punitive damages.  [Dkt. 19.]  In their motion, Defendants argue that punitive damages are not warranted in this case.  [Dkt. 52 at 34.] Specifically, citing to *Kentucky v. Graham*, 473 U.S. 159, 165 (1985), they argue that municipal entities and employees acting in their official capacity have absolute immunity from awards for punitive damages.  [*Id.*]  Mr. Robert failed to respond to this argument and thus waived any potential claim for punitive damages.  *United States v. Li*, 615 F.3d 752, 757 (7th Cir. 2010). Accordingly, if Mr. Robert's claims survived summary judgment, punitive damages would not be appropriate in this case.

[7] Defendants are correct to point out that the ADA Amendments Act, which became effective on January 1, 2009, significantly changed the landscape of disability law.  The amendments, however, do not apply retroactively.  *Fredricksen v. United Parcel Service, Co.,* 581 F.3d 516,

§ 12112(a) (2008). That version of the ADA defines a "qualified individual with a disability" as "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). It further specifies that an individual has a disability if he possesses "(A) a physical . . . impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(1). Given these definitions, an individual qualifies for protection under the ADA only if he (1) is disabled within one of those definitions and (2) can perform the essential functions of the relevant employment position. *Kupstas v. City of Greenwood*, 398 F.3d 609, 611 (7th Cir. 2005).

### 1. Is Mr. Robert Disabled Under the ADA?

A plaintiff is disabled under subsection (C) of § 121012(1) only if he can show that the defendant employer believed that he suffered from a physical impairment that substantially impaired his ability to work. *Sinkler v. Midwest Prop. Mgmt. LLP*, 209 F.3d 678, 686 (7th Cir. 2000). In this case, Mr. Robert conceded in his November 19 letter to Mr. Robert that he believed he must "offer [Mr. Robert] a reasonable accommodation, as required by the ADA." [Dkt. 60-1 at 15.] Because Mr. Robert acknowledged that Mr. Robert's back problems rendered him worthy of accommodation under the ADA, the Court finds that there exists a genuine issue of material fact as to whether Mr. Robert was "regarded as" disabled under the ADA and moves to the next stage of analysis. *Cf. Cigan v. Chippewa Falls School Dist.*, 388 F.3d 331 (7th Cir. 2004); § 121012(1)(C).

---

521 n. 1 (7th Cir. 2009). Since Mr. Robert's ADA claim arose before January 1, 2009, the Court will analyze it under pre-Amendments Act precedent.

It must also be noted, however, that in a disability discrimination claim, the employee's perceived disability must have been the "but-for" cause of the adverse action complained of. *Serwatka v. Rockwell Automation, Inc*., 591 F.3d 957, 962 (7th Cir. 2010). As Mr. Roberts appropriately admits, an employer must make reasonable accommodation for the *known* physical or mental limitations of an otherwise qualified employee with a disability. 42 U.S.C. § 12112(b)(5)(A) (emphasis added).

The extent to which an employer's errors in appreciating the extent of an employee's actual disabilities create obligations to accommodate is an open question. *See Cigan*, 388 F.3d at 334. However, an employer clearly cannot be penalized for failing to appreciate the gravity of an alleged physical ailment that was not brought to its attention and that did not impede the employee's work performance. "Indeed, the language of the ADA demonstrates that a reasonable accommodation is connected to what the employer *knows* about the employee's precise limitations." *Ekstrand v. School Dist. Of Somerset*, 583 F.3d 972, 977 (7th Cir. 2009), see 42 U.S.C. § 12112(b)(5)(A) (defining the term "discriminate" to include "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability") (emphasis added).

Since commencing this action, Mr. Robert has filed medical documentation with the Court illustrating a host of physical ailments unrelated to his back problems that he claims also render him disabled under the ADA. [Dkt. 59 at 18-20.] Mr. Robert, however, does not claim to have complained of any ailments other than his back to Sheriff Carter or any other superior during his tenure at HCSD. To the contrary, Mr. Robert maintains that these alleged ailments never impeded his work performance. [Dkt. 60-1 at ¶ 7.] Mr. Robert did not invoke any of these

conditions when he requested that Sheriff Carter exempt him from TASER training. [Dkt. 53-6 at ¶ 60.]

"What an employer knows is limited by the evidence the employer receives." *Ekstrand*, 583 F.3d at 576. Mr. Robert's discrimination claim therefore pivots on the single alleged condition that "he could not be tased because he was under treatment for chronic back problems and had a metal device in his spine"—not because of any other condition. [Dkt. 59 at 9; dkt. 53-2 at 42-43; dkt 53-6 at ¶¶ 59-62.] The Court, therefore, cannot consider the alleged physical ailments that are unrelated to Mr. Robert's back problems in determining whether Defendants discriminated against him because of his alleged disability in violation of the ADA.

### 2. Ability to Perform Essential Functions of the Job

To establish that he is a "qualified individual with a disability," Mr. Robert must establish not only that he has a disability within the meaning of the ADA, but also that he is qualified for the job. In other words, he must show that he is able "to perform the essential functions of the job, with or without reasonable accommodation." 42 U.S.C. § 12111(8); *Jackson v. City of Chicago*, 414 F.3d 806, 811 (7th Cir. 2005).

Mr. Robert offers two lines of reasoning for his claim that he was able to perform the essential functions of his job—the first rests on the premise that using a TASER is not an essential function of a civil deputy process server; the second rests on the premise that, even if using a TASER is an essential function, being tased as part of training in order to do so is not. [Dkt. 59 at 23.] The Court, then, must determine whether using a TASER and/or being tased as part of the training, are essential functions of a civil deputy process server.

### a. Is Using a TASER an Essential Job Function?

Sheriff Carter requires all civil deputy process servers to carry TASERS as part of their non-lethal weaponry, [dkt. 53-6 at ¶ 26]; this requirement, he claims, is "an essential function" of being qualified as a civil deputy process server. [*Id.* at ¶ 61.]

Generally, employers are allowed to determine the responsibilities and qualifications of a given position, and courts "do not otherwise second-guess the employer's judgment in describing the essential requirements of the job." *Basith v. Cook County*, 241 F.3d 919, 928 (7th Cir. 2001); 42 U.S.C. § 12111(8). An employer may specify, for legitimate reasons, multiple essential duties for a position, and an employee "will not be qualified for the position unless he can perform enough of these duties to enable a judgment that he can perform its essential duties." *Id.* at 929.

An employer would not, of course, be entitled to create pretextual qualifications. *Cf. Miller v. Illinois Dept. of Corrections*, 107 F.3d 483, 485 (7th Cir. 1997). If a plaintiff does present evidence that a requirement deemed essential is not, the Court may determine whether that duty is essential based on "the employee's job description, the employer's opinion, the amount of time spent performing the function, the consequences for not requiring the individual to perform the duty, and past and current work experiences," among other things. *Ammons v. Aramark Uniform Servs., Inc.*, 368 F.3d 809, 819 (7th Cir. 2004).

Mr. Robert argues that Sheriff Carter's characterization of TASERs as essential to the job is inappropriate. [Dkt. 59 at 25-26.] Citing exclusively to 29 C.F.R. § 1630.2(n)(2), he argues that using a TASER is not essential because—contrary to the regulations in § 1630.2(n)(2)—the position of civil deputy process server does not exist to perform the function of using a TASER, that there are not a limited number of employees who can use TASERs, and that Mr. Robert was not hired for his specialized expertise in using a TASER. [Dkt. 59 at 23-24.] He further argues

that the job of civil deputy process server is not dangerous enough that it warrants a TASER. [Dkt. 60-3 at 4.]

To illustrate the TASER's superfluity, Mr. Robert offers deposition testimony from Deputy Edwin Green, who says that although he carries a TASER, he has never had to use it. [Dkt. 60-5 at 7.] This testimony, however, does not raise a material issue of fact concerning Sheriff Carter's determination that carrying a TASER is an essential component of being a civil deputy process servers. Sheriff Carter, not any single employee, sets policy concerning the determination of essential duties, and he is not required to wait until a problem arises to implement the measures he believes will promote public safety and safety among his officers.

Mr. Robert also attests that, according to Dr. Moffatt's letter, he "is able to perform full duty functions from the standpoint of the job description provided by the department," other than the TASER training. [Dtk. 60-1 at 13.] There is no dispute that Mr. Robert was otherwise meeting the requirements of his job. The determination of what is an essential duty, however, lies in the hands of the employer, not the employee's doctor. *Basith*, 241 F.3d at 928.

Defendants argue that it is in fact essential for civil deputy process servers—who wear uniforms, carry guns, have arrest powers and regularly encounter agitated individuals—to have non-lethal weaponry that will temporarily incapacitate a combatant. [Dkt. 74-2 at ¶ 39.] Sheriff Carter argues that being equipped with a TASER gives the deputy a tool short of lethal force that does not entail the risk of serious injury or death when engaging in hand to hand combat. [Dkt. 73 at 9.] Although Mr. Robert claims that he was never in a situation that warranted using a TASER as a civil deputy process server, he acknowledges that such threats exist for such deputies. [Dkt. 55-1 at 32-34.]

The Seventh Circuit has emphasized the "special need for deference to the employment decisions of those responsible for ensuring public safety." *Kokkinis v. Ivkovich,* 185 F.3d 840, 845 (7th Cir. 1999). Accordingly, the Court is mindful that it "should defer, whenever possible consistent with the Constitution, to the superior expertise of law enforcement professionals in dealing with their respective personnel." *Kuchenreuther v. City of Milwaukee*, 221 F.3d 967, 974 (7th Cir. 2000). Indeed, the Hamilton County Sheriff's Department is better equipped than the Court to determine how best to protect the public and its deputies.

Furthermore, the Court is not limited in its analysis of essential job functions to the factors in § 1630.2(n)(2) that Mr. Robert outlines. *Ammons*, 368 F.3d at 819. The Court finds that having agreed with Sheriff Carter's clear rationale, [dkt. 53-6 at ¶39], Mr. Robert has not raised a genuine issue sufficient to undermine the integrity of Sheriff Carter's characterization of a TASER as essential to being a civil deputy process server. *Celotex*, 477 U.S. at 330. Therefore, there is no issue of material fact that using a TASER is an essential job function for a civil deputy process server.

### b. Is TASER Exposure an Essential Job Function?

In light of the essential nature of carrying a TASER, Sheriff Carter also deemed TASER training, including TASER exposure, essential to being a civil deputy process server. [Dkt. 53-6 at ¶¶ 33, 61.]

Mr. Robert argues, without a single citation to binding precedent, that even if carrying a TASER is essential, the TASER training involving TASER exposure itself is not. [Dkt. 59 at 2.] In support of this position, Mr. Robert argues, first, that because requiring exposure to this weapon is an anomalous training method, it cannot be essential. [Dkt. 59 at 34.] Additionally, Mr. Robert argues by analogy that insofar as officers may be excused from defensive tactics

training, so too should they be permitted to have medical exemptions to TASER training.  [*Id.*]  Mr. Robert also asserts that because TASER training is imposed inconsistently, it cannot be essential to the job.  [*Id.* at 25.]  Finally, Mr. Robert vaguely argues that because the training policy was not actually written anywhere, it should not be afforded deference.  [Dkt. 59 at 2.]

As Sheriff Carter explains, however, deputies cannot be shot by a firearm or beaten with nightstick without having substantial, long-term damage.  TASER exposure, on the other hand, does not result in long-term damage and teaches deputies first-hand the effects of the TASER—a widely misunderstood weapon that might otherwise be abused.  [Dkt. 74-2 at ¶ 32-35.]  Sheriff Carter does not allow medical exemptions from this training because, unlike defensive tactics training, which can be learned from watching, [dkt. 53-11 at 38], the TASER is a unique weapon because of its neuro-muscular incapacitating effects.  Its unique nature justifies specialized education and training that can be done with little risk of injury during training, [dkt. 74-2 at ¶¶ 32-35].  Furthermore, there is no evidence that any Hamilton County civil deputy process servers were exempted from TASER training.[8]  And even though the policy was unwritten, Mr. Robert does not dispute that it the expectation of participation was known or that he was otherwise notified of this policy.  [Dkt. 53-11 at 53-55.]

---

[8] In support of his allegation that the TASER training was applied inconsistently, Mr. Robert points the Court to the requirements of privately-contracted deputies, [dkt. 64-2 at 8], as well as deputies from other police departments, [dkt. 60-10], who carry guns but not necessarily TASERs.  Mr. Robert makes no evidentiary showing, however, that these special deputies are engaged in similar duties or even employed by the HCSD. As noted earlier, they are not valid comparators, and are irrelevant to the inquiry whether Hamilton County civil deputy process servers received uniform treatment with respect to Sheriff Carter's policy.  *Dandy v. United Parcel Service, Inc*. 388 F.3d 263. Additionally, Mr. Robert attempts to show that the training requirements were implemented inconsistently because Sheriff Carter was not tased until after this lawsuit was filed.  [Dkt. 59 at 5.]  As Defendants explain, however, Sheriff Carter underwent TASER training—the same training all civil deputies were required to undergo—when he began carrying a TASER.  [Dkt. 53-6 at ¶ 27.]  Because Mr. Robert does not contest this fact, the Court finds it undisputed for the purpose of this motion.  Fed. R. Civ. Pro. 56(e).

Mr. Robert has the burden of presenting specific facts to support every claim for which he would bear the burden at trial. *Celotex*, 477 U.S. at 330. Absent compelling evidence to the contrary, the Court is reluctant to challenge a uniformly-implemented policy of law enforcement. *DePaoli,* 140 F.3d at 674. Sheriff Carter's opinion, Mr. Robert's job responsibilities, and the potentially dangerous consequences of allowing Mr. Robert to carry a TASER without first being exposed to its effects weigh in favor of respecting Sheriff Carter's TASER uniformly-enforced policy. *Ammons*, 368 F.3d at 819. The Court therefore finds that the TASER exposure requirement, as determined by Sheriff Carter, is essential to the role of civil deputy process server.

Mr. Robert's inability to participate in the TASER training and, consequently, his inability to use a TASER, render him unable to perform his essential job functions. *Bryne v. Avon Products, Inc*., 328 F.3d 379, 381 (7th Cir. 2003) ("An inability to do the job's essential tasks means that one is not "qualified"; it does not mean that the employer must excuse the inability."). Mr. Robert therefore does not meet the threshold requirement for ADA protection. *DePaoli*, 140 F.3d at 674. Defendants are entitled to summary judgment on this ground.

### 3. Reasonable Accommodation

Even if using a TASER and/or being exposed to a TASER were not essential functions, however, Mr. Robert's ADA claim could not survive summary judgment. Indeed, it does not matter if a plaintiff is a qualified individual with a disability if he is offered a reasonable accommodation for his disability. *Bellino v. Peters*, 530 F.3d 543 (7th Cir. 2008). The Court therefore assumes, without deciding, that for the purposes of this discussion, Mr. Robert is a qualified individual with a disability. *Gratzl v. Office of Chief Judges*, 601 F.3d 674, 679 (7th Cir. 2010) ("We need not . . . resolve this question of interpretation of a superseded law because,

even if he has a disability, [the plaintiff] is not entitled to relief under the ADA [because] he rejected the reasonable accommodation [he was] offered.").

To prevail on a failure to accommodate claim, a plaintiff must show not only that (1) he is a "qualified individual with a disability," but also that (2) the defendant was aware of his disability, and that (3) the defendant failed to reasonably accommodate the disability. *EEOC v. Sears, Roebuck & Co.*, 417 F.3d 789, 797 (7th Cir. 2005). Because a genuine issue exists as to whether Mr. Robert was "regarded as" having a disability by Sheriff Carter, § 121012(1)(C), the Court will assume that elements one and two are met. The Court's focus thus turns to whether Sheriff Carter offered him a reasonable accommodation.

The facts are undisputed that Mr. Robert was offered a new job that would have the same rate of pay, the same hours, and the same benefits as his old job, [*id.* at 1-2]; however, it would not include a department car, gas, car insurance, or repair payments because the new position would not involve driving, [dkt. 53-11 at 76]. Like the civil deputy process server position, The control room position was also a non-merit, at-will position. [Dkt. 59 at 14.]

As an initial matter, the burden is on Mr. Robert to prove that Defendants failed to offer him a reasonable accommodation. *City of Madison v. King*, 550 F.3d 598, 600 (7th Cir. 2008); 42 U.S.C. § 12112(B)(5)(A). But an employer is not obligated to provide an employee the accommodation he requests or prefers, or even the *most* reasonable accommodation—the employer need only provide some reasonable accommodation. *Gile v. United Airlines*, 95 F.3d 492, 499 (7th Cir. 1996), *see also Jay v. Intermet Wagner, Inc*., 233 F.3d 1014, 1017 (7th Cir. 2000). The ADA defines "reasonable accommodation" to include "job restructuring . . . reassignment to a vacant position, acquisition or modification of equipment or devices,

appropriate adjustment or modifications of examinations, training materials or policies . . . and other similar accommodations." 42 U.S.C. § 12111(9).

### a. Mr. Robert's preferred accommodation.

At its simplest, Mr. Robert's most emphatic complaint is that he should have been accommodated with an exemption from TASER training. In support of his argument, Mr. Robert offers testimony of Jeffrey Patterson, an Indianapolis Metropolitan Police Department ("IMPD") officer. [Dkt. 60-10.] Citing Officer Patterson's testimony, Mr. Robert argues that "the accommodations that would have allowed Mr. Robert to remain in his job are actually used by the IMPD." [Dkt. 59 at 27.]

As an initial matter, Officer Patterson's testimony about IMPD does not bear on the requirements set out by HCSD. Moreover, a careful reading of Officer Patterson's affidavit does not support Mr. Robert's conclusion that IMPD officers can carry TASERs without being exposed. [Dkt. 60-10 at 2.] To the contrary, Officer Patterson explains, "IMPD officers do not have to carry TASERS. If they do not want to carry TASERS, they do not have to go through the TASER training . . . ." [*Id.*] Given that IMPD officers do not have to carry tasers, Mr. Patterson's testimony that they do not have to undergo TASER training is inapposite. In fact, it could be read to support Sheriff Carter's position: those that carry TASERS do have to undergo TASER training.

Sheriff Carter is not required under the ADA to exempt Mr. Robert from essential functions of the job. *Miller v. Ameritech Corp.*, 214 Fed.Appx. 605, 609 (7th Cir. 2007). To the contrary, "[i]t is the employer's prerogative to choose a reasonable accommodation; an employer is not required to provide the particular accommodation that an employee requests." *Jay*, 233 F.3d at 1017. Particularly when public safety is at issue, the Court defers to the superior

expertise of law enforcement professionals, such as Sheriff Carter, to determine the appropriate accommodation. *See Kuchenreuther*, 221 F.3d at 974. Because Sheriff Carter was not required to exempt Mr. Roberts from TASER training under the ADA, Mr. Robert's argument that he should simply have been excused from training and allowed to carry a TASER fails.

### b. Reasonableness of offered accommodation.

Mr. Robert also argues that the control-room position is not a reasonable accommodation. Toward this end, he claims that physical ailments largely unrelated to his back injury—ranging from long-term Crohn's disease to painful arthritis in his neck and back, to problems with his knees, [dkt. 59 at 10-11; dkt. 88-1]—would be exacerbated by this job. [Dkt. 59 at 28.] Mr. Robert purports that his alleged physical problems result in hyper-sensitivity to when and what he eats, sometimes urgent need to use the restroom, inability to sleep without interruption every two-to-three hours because of numbness/swelling in his legs, great fatigue, inability to walk more than a quarter mile without severe pain, and inability to sit in the same position for an extended period of time. [Dkt. 88-1; dkt. 60-1 at 2-3.] Although Mr. Robert maintains that these alleged ailments do not impair his ability to work as a civil deputy process server, he claims that they substantially limit his major life activities and would be further exacerbated by the requirements of the control-room position.

The Court emphasizes here that "the language of the ADA itself demonstrates that a reasonable accommodation is connected to what the employer knows about the specific limitations affecting an employee." *Jackson v. City of Chicago*, 414 F.3d 806, 813 (7th Cir. 2005); *see also* 42 U.S.C. § 12112(b)(5)(A) (defining the term "discriminate" to include "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability"); *see also Beck v. Univ. of Wisconsin Bd*. of Regents, 75

F.3d 1130, 1135 (7th Cir. 1996) ("By the statutory language, 'reasonable accommodation' is limited by the employer's knowledge of the disability.").

Because Mr. Robert's alleged non-back related ailments were not presented to Defendants when he requested the accommodation, Defendants were under no obligation to consider them in the interactive process of determining what a reasonable accommodation would be. Similarly, these ailments need not factor into the Court's consideration of whether the accommodation Sheriff Carter offered—in light of his knowledge concerning Mr. Robert's alleged disability—was reasonable.

Even if the undisclosed conditions were relevant, however, they still would not advance Mr. Robert's claim. Mr. Robert admits that as a control-room deputy, he would have ready access to a bathroom (which is in the control room itself). Additionally, he makes no argument and presents no evidence that he would be restricted from bringing his own food and eating it on his own timetable. [Dkt. 59 at 28.] Likewise, he presents no evidence that he would be confined to his seat any more than he would as a civil deputy process server, nor does he claim that the accommodation would require him to walk. Indeed, in light of the Mr. Robert's alleged medical problems, the control-room position seems to better accommodate his ailments than the process-server position.[9] Thus, even if Defendants were obligated to consider Mr. Robert's alleged non-back related ailments, these ailments would not have rendered the accommodation unreasonable.

Mr. Robert next argues that the control-room position is not a reasonable accommodation because it is not comparable to the civil deputy process server position. [Dkt. 59 at 27.] In support of this claim, Mr. Robert presents the testimony of Civil Deputy Process Server Bud Green. [Dkt. 60-5.] Mr. Green, who has, during all relevant times, been planning to retire at the

---

[9] As a practical matter, the Court would be remiss to describe as "reasonable" an accommodation that keeps anyone who consistently suffers from "great fatigue" behind the wheel of a car.

end of 2011, stated during his deposition that he would rather retire than take the control-room position. [Dkt. 60-5 at 6.] In addition to being speculative and impermissible opinion testimony, Mr. Green's testimony is irrelevant to the inquiry of whether the control-room position was a reasonable accommodation for Mr. Robert.

Mr. Robert further contends that the control room position is different than the process server position in nature: "The jail Control Room position would require sitting in a room and staring at a computer screen all day. He would have had to use the bathroom there, and eat his lunch there. The jail Control Room position did not include a car, fuel, insurance or repairs." [Dkt. 59 at 28.]

Defendants concede that the control-room position is "by its nature, different than the civil process server position because the position does not involve contact with the public and does not necessitate driving around to serve legal papers." [Dkt. 73 at 12.] But they point out that Mr. Robert would have the same hours, rate of pay, and benefits as he would in the process server position.

Generally, offering an employee a different position with substantially the same salary and benefits is a reasonable accommodation. *See Vande Zande v. State of Wisc. Dept. of Admin*, 44 F.3d 538, 545 (7th Cir. 1995); *Karbusicky v. City of Park Ridge*, 950 F. Supp. 878, 884-85 (N.D. Ill. 1997). In determining whether a transfer is appropriate, the critical factor is not whether the new position looks exactly like the job the employee's disability prevents him from performing; rather, it is the match between the employee's knowledge, skills, and abilities and the legitimate requirements for other positions with the employer. *Hendricks-Robinson v. Excel Corporation*, 154 F.3d 685, 695 (7th Cir. 1998).

Here, Mr. Robert's explanation of the differences between the process server position and the control-room position does not render the latter unreasonable. Nor does his argument that the control-room position does not include a car, insurance, or repair costs—particularly since the control-room position does not require or involve the use of a car. *Fry v. Sheahan*, 2009 WL 2496575, *5 (N.D. Ill 2009) ("That the position paid $7,000 a year less than her previous position does not run afoul of the ADA."). Despite his dissatisfaction with the accommodation he was offered, Mr. Robert has not presented admissible evidence to show that it is an unreasonable one, nor does he present a single case in support of that claim.

To the contrary, the Court finds that the accommodation he received was reasonable. Mr. Robert does not have the right under the ADA to refuse a reasonable accommodation simply because it is not the one he preferred. *Gile*, 95 F.3d at 499 ("When an employee requests a transfer as reasonable accommodation and the employer offers alternative reasonable accommodation, which the employee then refuses, the employer cannot be liable for failing to reasonably accommodate the employee. . ."). By requesting an accommodation, and then refusing a reasonable accommodation offered by his employer, Mr. Robert thwarted the interactive process between employer and employee required for relief under the ADA. *Id.*

In sum, Mr. Robert's challenge to the offered accommodation fails for four reasons. First, he is not entitled to choose the accommodation he receives. Second, the accommodation he was offered is comparable to the civil deputy process server in all relevant respects. Third, to the extent that the two positions are not comparable, the control-room position actually better accommodates Mr. Robert's physical ailments. Fourth, by refusing a reasonable accommodation, Mr. Robert terminated the interactive process himself. For each of these

reasons, the Court finds that Defendants are entitled to summary judgment on Mr. Robert's ADA claim.

### B)  § 1983 Due Process Claims

Mr. Robert further alleges that Defendants violated his due process rights when they terminated his employment with the HCSD.  [Dkt. 1 at ¶ 22-23.]

### 1.  Procedural Due Process

First, Mr. Robert claims that he was summarily fired without his right to a pre-termination hearing in violation of his procedural due process rights.  Specifically, he  argues that since he was never told he became a special deputy, he was not a special deputy and was therefore not subject to at-will termination under Ind. Code § 36-8-10-10.6.  As a civil deputy, he argues, his employment was governed by the Sheriff's General Orders, which contain a statutory provision for a pre-termination hearing under Ind. Code § 36-8-10-11(a).  [Dkt. 59 at 32.]

The procedural component of the due process clause protects against deprivation of life, liberty or property interests without a prior hearing.  *Board of Regents of State Colleges v. Roth*, 408 U.S. 564, 569 (1972).  Property interests are created and defined by an independent source, such as state law or a contract.  *Miyler v. Village of East Galesburg*, 512 F.3d 896, 898 (7th Cir. 2008).  An employee claiming a property interest in his continued employment under Indiana law must establish that someone "in his position has an entitlement to his job."  *Lawshe v City of Gary, et al.,* 16 F.3d 1475, 1480 (7th Cir. 1994).  Proving entitlement requires that there is an independent source such as state law securing certain benefits, or that there is a clearly implied promise of continued employment.  *Shlay v. Montgomery*, 802 F.2d 918, 921 (7th Cir. 1986).

While a public employee does not have a federal due process right to a hearing prior to discharge simply because he is a public employee, a written contract with an explicit tenure

provision is evidence of an entitlement to continued public employment. *Perry v. Sindermann*, 408 U.S. 593, 602 (1972). An entitlement may also be shown by an implied agreement gleaned from the promisor's words and conduct in light of the surrounding circumstances, and the meaning of the promisor's words and acts as found by relating them to the usage of the past. *Id*. Under some circumstances, public employee handbooks can create a vested right in continued employment. *Wells v. Auberry*, 476 N.E.2d 869,873 (Ind. Ct. App. 1985).

Whether Mr. Robert is a special deputy or simply a civil deputy is inconsequential here, as there is no dispute that Mr. Robert retired as a merit deputy in 2007—at that time, he not only took a civil deputy job, but also began receiving his merit deputy retirement benefits. [Dkt. 53-6 at ¶¶ 40-41.] There is likewise no dispute that the Sheriff's General Orders (which indeed trump conflicting provisions in the Hamilton County Employee Handbook) explicitly apply only to "merit personnel"—not to civil deputies. [Dkt. 60-1 at 6.] Therefore, regardless whether Mr. Robert was a special or merely a civil deputy, he was not governed by the Sheriff's General Orders once he retired as a merit deputy. At that point, he became an at-will employee; accordingly, his employment was simply governed by the Employee Handbook, which expressly does not create a vested right in continued employment. [Dkt. 53-13 at 1-2; 47.]

Because he was an at-will employee, he had no property interest in his employment and therefore no right to a hearing. *Krieg v. Seybold*, 481 F.3d 512, 520 (7th Cir. 2007). Whether or not he knew he was an at-will employee is irrelevant: To demonstrate that there is a protected interest, a plaintiff must show more than a "unilateral expectation" or an "abstract need or desire" for the employment. *Roth*, 408 U.S. 564. The Court therefore finds that Mr. Robert had no property interest in his continued employment as a civil deputy process server. As such, he

was not entitled to a pre-termination hearing. Defendants are therefore entitled to summary judgment on Mr. Robert's due process claim.

Moreover, even if Mr. Robert had a legitimate entitlement to continued employment under I.C. § 36-8-10-11(a), he could not bring this claim in federal court because he did not exhaust his state remedies under the Indiana Civil Rights Act ("ICRA").

Section 36-8-10-11 provides, in pertinent part, "[t]he sheriff may dismiss, demote, or temporarily suspend a county police officer for cause after preferring charges in writing and after a fair public hearing before the board, which is reviewable in the circuit court." Indeed, as Defendants point out, the ICRA prohibits employers from discriminating against individuals because of a disability. See I.C. § 22-9-1-13. Likewise, the Indiana Civil Rights Commission ("ICRC") has the authority to investigate complaints of discriminatory practices under Indiana law. I.C. §22-9-1-6(d). If the ICRC finds a person or entity has engaged in an unlawful discriminatory practice, it can restore a complainant's losses incurred as a result of discriminatory treatment through remuneration for wages, salary, or commissions. I.C. § 22-9-1-6(k)(A). The Court therefore finds that, even if Mr. Robert had a statutorily conferred property interest in his job, he did not exhaust his state-court remedies, as required, before seeking redress in this Court.

### 2. Substantive Due Process

Mr. Robert also claims that the implementation of the TASER policy violated his substantive due process rights.

There are two types of substantive due process violations. The first occurs when the state actor violates an identified liberty or property interest protected by the Due Process Clause. *T.E. v. Grindle*, 599 F.3d 583, 589 (7th Cir. 2010). The second occurs when the state actor's conduct

is so utterly unreasonable that it "shocks the conscience." *Id.* This Court has already determined that Mr. Robert did not have a property interest in his employment.[10] Furthermore, Mr. Robert does not argue that TASER training implicates any other fundamental rights.[11] Thus, the Court turns to whether the government action at issue shocks the conscience.

Where an action does not implicate fundamental rights, the basic standard for determining it shocks the conscience "is whether the government action was arbitrary," or "utterly unreasonable—that is what 'arbitrary' means in this setting." *Wroblewski v. City of Washburn*, 965 F.2d 452, 457-58 (7th Cir. 1992). "Review for nonarbitrariness under the due process clause is, for our purposes, analogous to review for a 'rational basis' under the equal protection clause." *Wroblewski*, 965 F.2d. at 458; *see also Turner v. Glickman*, 207 F.3d419, 426 (7th Cir. 2000). The parties agree that this is the proper test. [Dkt. 73 at 81; dkt. 59 at 33.]

Generally, governmental action will survive the rational-basis test so long as the action bears a rational relationship to a legitimate governmental interest. *Vaden v. Village of Maywood, Ill.*, 809 F.2d 361, 364 (7th Cir. 1987).

Mr. Robert does not directly challenge the legitimacy of the government interest at issue. Instead, he argues that his substantive due process rights were violated because Sheriff Carter's TASER policy is arbitrary and irrational:

> No one has to be shot to carry a gun. No one has to maced or hit with a nightstick to carry those weapons. Officers can provide medical excuses for defensive tactics training which the Sheriff states is "very, very important" and "fundamental," but they cannot for [TASER] training. Not all officers who carry guns have to carry a [TASER]. Wearing a

---

[10] In any event, a claim that employment was wrongfully terminated is not alone sufficient to state a substantive due process claim; a plaintiff must also demonstrate that the defendants violated some other constitutional right or that available state law remedies were inadequate. *Montgomery v. Stefaniak*, 410 F.3d 933, 939 (7th Cir. 2005).
[11] Mr. Robert does not argue that he has a liberty interest in his bodily integrity, or that the TASER training violates this interest. *See Ingraham v. Wright*, 430 U.S. 651 (1977).

uniform may or may not be a factor. Being in the public may or may not be a factor. It is clear that the [TASER] rule has never been applied uniformly.

[Dkt. 59 at 34.]

In support of this claim that the TASER training is arbitrary, Mr. Robert points to the fact that he was excused from defensive tactics training, which Sheriff Carter claimed was just as important as the TASER training. [Dkt. 59 at 8, 34.] Toward the same end, Mr. Robert offers testimony from Mr. Green, who was also excused from defensive tactics training. [Dkt. 60-5 at 4.] If the two types of training are equally important, Mr. Robert says, the requirements for exemption should be the same.

The policies governing the defensive tactics training, however, do not raise a genuine issue as to whether the TASER policy was uniformly implemented. In fact, Mr. Green, who was almost 20 years the senior to Robert, went through TASER training. [Dkt. 73 at 2.] Other than Sheriff Carter, who went through the TASER training when he was issued a TASER, [dkt.74-2 at ¶ 11], Mr. Robert does not claim that any other officer was excused from the TASER training.

Mr. Robert further argues that HCSD's TASER policy is arbitrary because TASER International does not require the purchasers of TASERS to be exposed to a TASER shock. [Dkt. 59 at 3; dkt. 60-11.] But TASER International does not set policy or requirements for HCSD, nor do they dispute Sheriff Carter's attestation that it is up to each department that has TASERs to establish their training program. [Dkt. 53-11 at 59.] Accordingly, this argument is not relevant to the Court's determination.

In the end, Mr. Robert has offered no evidence that HDSC's TASER training policy is not uniformly implemented, let alone arbitrary.

Mr. Robert argues that the policy is irrational on the same grounds. Again, the Court disagrees. It follows from this a well-settled principle that police departments have a legitimate

interest in minimizing the risk of violence to the public, *U.S. v. Jennings,* 544 F.3d 815, 818 (7th Cir. 2008). It follows then that the HCSD has a legitimate interest in educating, training and equipping deputies with non-lethal weapons. Deploying such non-lethal weapons to all deputies, and then implementing a TASER qualification program that requires all deputies using a TASER to be tased one time is directly related to training deputies to handle the effects of combatants whom they tase and of being tased themselves. As Defendants explain, the exposure not only gives the trainee an understanding of how effective the TASER can be in momentarily disabling someone, including the officer, but it also disabuses them of the myth that the officer will be exposed when he tases the combatant—which is vital to an officer making an arrest immediately after tasing a combatant. [Dkt. 53-6 at ¶ 33.] Further, the exposure should act as a valuable deterrent for abusing this weapon and will boost the credibility of deputies who have to testify as witnesses.

In the face of these rational justifications for the training, Mr. Robert has not raised an issue of fact sufficient to give rise to a substantive due process claim. *Turner v. Glickman*, 207 F.3d 419, 426 (7th Cir. 2000). Summary judgment is proper for Defendants on this claim.

## IV.
### LIABILITY AS TO ALL PARTIES

In his Amended Complaint, and on Defendant's Motion to Dismiss his Amended Complaint, Mr. Robert argues that the Hamilton County Council and the Hamilton County Board of Commissioners are liable for this action for having "played a role" in the decision to implement the TASER policy and the decision to terminate Mr. Robert's employment. [Dkt. 19; *see also* dkt. 28 at 6.] But Mr. Robert has produced no evidence in discovery or in response to this Motion for Summary Judgment to suggest that these entities were responsible either for the TASER policy, for its implementation, or for Mr. Robert's termination. In any event, having

found no liability as to Sheriff Carter, the Court similarly finds that the Hamilton County Council

and the Hamilton County Board of Commissioners are not liable in this matter.

## V.
### CONCLUSION

For the foregoing reasons, the Court **GRANTS** Defendants' Motion for Summary

Judgment. [Dkt. 51.] Mr. Robert shall take nothing by way of his Complaint. Judgment will

enter accordingly.

05/03/2011

Hon. Jane Magnus-Stinson, Judge
United States District Court
Southern District of Indiana


**Distribution via ECF only:**

Brandi A. Gibson
COOTS HENKE & WHEELER, P.C.
bgibson@chwlaw.com

Matthew L. Hinkle
COOTS HENKE & WHEELER
mhinkle@chwlaw.com

Daniel LaPointe Kent
LAPOINTE LAW FIRM P.C.
dkent@lapointelawfirm.com

Mary Jane Lapointe
LAPOINTE LAW FIRM PC
maryj@lapointelawfirm.com

Blake N. Shelby
COOTS HENKE & WHEELER, P.C.
bshelby@chwlaw.com